## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### Tyler Division

| | |
|---|---|
| **Physician Hospitals of America** | ) |
| | ) |
| **and** | ) |
| | ) |
| **Texas Spine & Joint Hospital, Ltd.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **Case No. _____** |
| | ) |
| **Kathleen Sebelius, in her official** | ) |
| **capacity as Secretary of the United** | ) |
| **States Department of Health and** | ) |
| **Human Services,** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I. INTRODUCTION

This is an action for declaratory and injunctive relief brought by Physicians Hospitals of America ("PHA") and Texas Spine & Joint Hospital, Ltd. ("Texas Spine & Joint," or "the Hospital") to enjoin the implementation and enforcement of Section 6001 of the Patient Protection and Affordable Care Act (P.L. 111-148) and the Health Care and Education Reconciliation Act (P.L. 111-152) (collectively, hereafter, "Section 6001," "the Physician Hospital Law," or "the Law") that has singled out hospitals owned by physicians in the United States for retroactive regulation and restriction, for arbitrary and irrational reasons. The Physician Hospital Law prevents a new physician-owned hospital facility from receiving Medicare certification after the end of this year if its physician-owners refer Medicare patients to that hospital, and restricts physician

ownership in Medicare-certified hospitals.   Moreover, the Physician Hospital Law endeavors to restrict any existing Medicare-certified physician-owned hospital from expanding the number of licensed beds, operating rooms, or "procedure rooms," unless that hospital meets certain vague and contradictory qualifications that will allow an "exception" to the Law's general prohibition on growth.   These prohibitions apply to all physician-owned hospitals across the nation, without regard to the physicians' or hospitals' specific record of billing compliance with Medicaid or Medicare regulations, their performance in preventing patient deaths, their advancement of the cause of medical science, their compliance with medical standards of conduct, or any other objective or discernible quality criterion.   Yet these provisions apply only to physician-owned hospitals, not hospitals of similar design, function, or management owned by individuals or entities of any other occupation.

## II. <u>PARTIES</u>

1.     Defendant Kathleen Sebelius is named in her official capacity as Secretary for the U.S. Department of Health and Human Services ("DHHS").   As Secretary of DHHS, Defendant Kathleen Sebelius, together with her agents and successors, is responsible for the enforcement of the Physician Hospital Law.

2.     Plaintiff PHA is a Section 501(c)(6) organization formed to educate members of the physician-owned hospital community about regulatory and legislative issues, and to encourage PHA members to advocate for the rights of physician-owned hospitals.   PHA has over 166 member hospitals in 34 different states, comprising both existing facilities and physician-owned hospitals in various stages of development.   The PHA member hospitals are typically enrolled as providers under the Medicare and

Medicaid programs with up to 70% of their case mix stemming from Medicare and Medicaid patients; the physician owners of the member hospitals are also providers under the Medicare and Medicaid programs. Each of the PHA members is directly and adversely affected by the Physician Hospital Law.

3.      Texas Spine & Joint is a licensed hospital with 20 beds located at 1814 Roseland Boulevard in Tyler, Texas.  The Hospital is a licensed provider in the Medicare and Medicaid programs.  First opening its doors in 2002 in an abandoned Montgomery Ward store retrofitted as a hospital, it is owned by physicians who are also enrolled in the Medicare and Medicaid programs.  The Hospital is a licensed acute-care hospital in the state of Texas, providing in-patient and out-patient surgery and in-patient medical services.  The Hospital was rated number one in the state of Texas in 2009 for spine surgery by the Eleventh Annual HealthGrades Hospitals in America Study.  The Hospital was Five-Star rated for Joint Replacement, Spine Surgery, Total Knee Replacement and Back and Neck Surgery at various points between 2006 and 2008. The Hospital is directly and adversely impacted by the Physician Hospital Law.  Pressed by rising patient needs, the Hospital bought expansion property for $2.1 million in 2008. The Hospital then participated in a protracted zoning process, ultimately winning local approval of the right to alter the designation of the parcel it purchased so it could expand its facility, an improvement for which the Hospital has already expended around $500,000 in professional fees and services.  To bring the expansion to fruition, Texas Spine & Joint terminated the commercial tenants' leases, forgoing rentals of $533,236 per year.  The Hospital's lawful investment of nearly $3 million in this expansion would be squandered if it were unable to bring the expansion online.

### III. JURISDICTION

4.      Plaintiffs invoke the jurisdiction of this Court under 28 U.S.C. §§ 1331 and 1343, in that they seek declaratory and injunctive relief for the Government's violations of the Fifth Amendment of the United States Constitution.   Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

5.      Plaintiffs have no administrative remedy available to them that would allow them to challenge the constitutionality of the Physician Hospital Law.

6.      An  actual  controversy  exists  between  the  parties  concerning  the constitutionality of the Physician Hospital Law.   That controversy is justiciable in character, and speedy relief is necessary to preserve Plaintiffs' rights.

7.      A  declaratory  judgment  will  terminate  the  uncertainty  debilitating  the decisions and actions of PHA members and the Hospital, and curtail the controversy between the parties.

8.      A preliminary injunction, enjoining Defendants from taking any action to enforce  the  Physicians  Hospital  Law,  would  protect  Plaintiffs'  rights  while  these proceedings are pending.

9.      A  permanent  injunction,  enjoining  Defendants  from  enforcing  the Physicians Hospital Law, would protect Plaintiffs' rights after the resolution of this case.

### IV. VENUE

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

### V. FACTS

11.     The  Physician  Hospital  Law  attempts  to  impose  sweeping  and unprecedented restrictions on the rights of physicians and their immediate family

members to own hospitals and to participate in Medicare programs. For example, a physician and his or her immediate family are ostensibly prohibited after December 31, 2010 from opening a new Medicare-certified hospital and referring Medicare patients to that hospital. Similarly, following the date of enactment of the Physician Hospital Law, an existing Medicare-certified physician-owned hospital will apparently be prohibited from increasing the aggregate percentage of the hospital held by physicians.

12.    The Physician Hospital Law also tries to prohibit existing Medicare-certified physician-owned hospitals from expanding after March 23, 2010, unless those hospitals conform to unclear and contradictory standards that will permit an "exception" to be issued by the Secretary of DHHS.   Section 6001(d)(3)(D) (42 U.S.C. § 1395nn(d)(3)(D)) allows increased physician-ownership of a hospital that "meets the requirements described in subsection (i)(1) not later than 18 months after the date of the enactment [i.e., Sept. 23, 2011]." Yet the plain language of certain requirements of (i)(1) demands that hospitals cease all expansion and aggregate physician ownership increases after March 23, 2010 if they wish to qualify for expansion, instead of after eighteen months as provided in (d)(3)(D).

13.    The Physician Hospital Law irrationally and arbitrarily singles out physicians and their families for a prohibition from owning a legal and necessary business—a hospital—that anyone else in Smith County or the country can own. The Physician Hospital Law is neither rational nor reasonably related to any quality or medical care issues. Its sole rationale is to arbitrarily prohibit a class of U.S. citizens, physicians, from owning a legal business for the improper purpose of protecting non-physician-owned hospitals from unwanted competition.

**Emergence of Physician Owned Hospitals**

14.     Physician-owned hospitals have long been an integral part of the medical care landscape in the U.S.   In fact, some of the first hospitals in many communities were started by physicians, because there was no hospital facility nearby.   Those physician-owned facilities allowed physicians to influence and assure the quality and scope of care provided.

15.     Physician-owned hospitals rapidly expanded in the 1990s and early 2000s as physicians sought to refine quality of service quality and work in more personal hospital settings free from corporate control and an expanding array of mergers and managers.   These physicians typically branched off to form their own hospitals in order to improve patient care, provide patient choice, and make hospitals more convenient to their patients.

16.     Many physician-owned hospitals began as "rescue" projects with physicians investing their own capital to save non-performing facilities, often in areas where underserved and minority patients would be deprived of critical local care without this intervention.

17.     Today, physician-owned hospitals are of many types, including general-acute community hospitals, rural hospitals, specialized surgical hospitals, rehabilitation centers, women's and children's hospitals, and psychiatric facilities.

18.     Currently, there are approximately 265 physician-owned hospitals in the country.   In addition, there are 29 that are scheduled to open and receive their Medicare certification by December 31, 2010.   An additional 45 hospitals are currently under development and are not expected to be open or Medicare-certified by December 31,

2010.  Furthermore, there are 39 hospitals that were previously under development and are currently not continuing the development process due to the Physician Hospital Law.

19.    Physician-owned hospitals have considerable community impacts and are vital to local economies. They employ over 75,000 full and part time employees and have an average annual payroll of $13,000,000 per hospital, with $3.4 billion in cumulative annual payroll nationally. In addition, over $4 billion per year is spent by physician owned hospitals on other clinical and non-clinical goods and services.

20.    Physician-owned hospitals also fuel the Government's ability to service citizens.  Unlike the not-for-profit hospitals favored under the Physician Hospital Law, physician-owned hospitals pay federal, state, and local taxes of $3 million per facility per year on average, without even including the physician owners' income taxes.

21.    Physician-owned hospitals serve their communities.  They provide charity and bad-debt write-offs on average of 5.3% per facility, which is higher than at many not-for-profit hospitals.

22.    Physician-owned  hospitals  build  communities.    Nearly  25%  are undergoing expansion right now, pumping around $450,000,000 in investment into local economies; of the 32 hospitals currently scheduled to open the first part of 2010 and the 73 scheduled to open after December 31, 2010, over $5 billion of the expansion cost is already invested or financed.  These new hospitals would generate upwards of 25,000 more jobs, if they were permitted to open.

23.    The U.S. Government has consistently expressed value for physician-owned hospitals. By all measures of health care quality, including staff specialization

and clinical staff per patient and complication rates, physician-owned hospitals have fared highly favorably.  In a key 2005 federal study, entitled "Study of Physician-Owned Specialty Hospitals Required in Section 507(c)(2) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003" (the "HHS Study") by Michael O. Leavitt, Secretary of DHHS, physician-owned hospitals were extolled as valuable and efficient health care models.

**Past Scrutiny of the Physician-Owned Hospital Model**

24.     Congress targeted for control the physician ownership of ancillary services in 1989, such as independent clinical labs and radiology equipment.  See 42 U.S.C. § 1395, et seq. ("the Stark Act").  The purported aim was to reduce physician use of the ancillary services.  However, even the Stark Act and its attendant regulations allowed physicians to provide those services if the services were provided within their own offices.  42 U.S.C. § 1395nn(b).

25.     Additionally, the Stark Act allowed physicians to invest in the whole hospital, as opposed to just a department of the hospital.  42 U.S.C. § 1395nn; 42 C.F.R. § 411.356(c)(3).  In fashioning this "whole hospital" provision in 1989 and modifying it only slightly in 1993, the Government openly recognized that there was no legitimate reason to disallow physicians from participating in ownership of a hospital, just like physicians had done for many years.  Wherever and whenever the physician personally performed a service for his or her patient, the Stark Act permitted physician-ownership of that facility.

26.     Starting in 2001, opponents of physician-owned hospitals lobbied for legislation that would alter the "whole hospital" exception.  These opponents were

typically competing non-physician-owned hospitals, or their allies.   Their disparaging and unobjective claims have been rejected repeatedly by the Government, in numerous and extensive government studies.

27.   In the Medicare Modernization Act of 2003, Congress directed CMS to impose an eighteen-month moratorium so that the Medicare Payment Advisory Commission ("MedPAC") could conduct a study of physician-owned hospitals.  In order to conduct this study, the moratorium prohibited physician owners at new "specialty hospitals" from seeing Medicare and Medicaid patients.  Also, existing physician-owned hospitals continued as Medicare providers, but they could not grow or add investors during the moratorium.

28.   MedPAC issued a final report, entitled "Physician-Owned Specialty Hospitals," to Congress in March of 2005.  The MedPAC study proved to be positive for physician-owned hospitals.   MedPAC reported that while physician-owned hospitals might temporarily reduce the volume of patients treated by non-physician-owned hospitals in certain specialties, those non-physician-owned hospitals remained profitable over time, despite the economic competition they now faced with "specialty hospitals." MedPAC reported no quality decrease, abuse, or other substantive negative finding concerning physician-owned hospitals.   MedPAC concluded that the most common reason for physicians to establish surgical hospitals was governance—the physicians wanted to control decisions made about their practices and patients.

29.   CMS began its own study in June 2005, accompanied by another moratorium under which new physician-owned specialty hospitals were precluded from applying for Medicare certification until CMS finished its work.

30.    CMS issued its report in August 2006, concluding that specialty physician-owned hospitals provide high patient satisfaction, high quality of care, and improved patient outcomes, as well as greater predictability in scheduling and services. ("Final Report to the Congress and Strategic and Implementing Plan Required under Section 5006 of the Deficit Reduction Act of 2005.")  Regarding referral patterns, CMS reported that physician-owners do not refer their patients exclusively to the specialty hospitals that they own.   CMS found that physician-owned hospitals also refer patients to competing local non-physician-owned hospitals.    CMS found that there were no consistent patterns of preference, and that physician-owners did not unduly refer patients to specialty hospitals.

31.    The CMS study noted that the uncompensated care provided by physician-owned hospitals, in combination with the significant taxes paid by physician-owned hospitals, provided a net community benefit almost eight times higher when a physician-owned hospital enters a community than when a non-physician owned hospital does.

32.    In August 2006, CMS publicly voiced its approval of the physician-owned hospital model by expressly removing the imposed moratorium, allowing physician hospitals to unrestricted growth as the policy of the DHHS.

33.    There was good reason for the federal confidence: the 2005 HHS Study showed that mortality rates for all medical procedures are significantly lower in physician-owned hospitals than in other hospitals, and that patients at non-physician-owned hospitals are three to five times more likely to experience complications than at physician-owned hospitals.

34.     Independent quality analysts have also concluded that physician-owned hospitals provide excellent quality care.  The leading independent healthcare ratings company HealthGrades awarded a number of hospitals specializing in Cardiac or Orthopedic services five stars (for functioning in the top 15% of hospitals in the country). Other physician-owned hospitals were ranked by HealthGrades first or second for the type of care they provide in their respective states, or were ranked in the top 5–10% in the country for the type of care they provided.

35.     Moreover, in the November 2008 Thompson-Reuters publication "Best Community Hospitals for Cardiovascular Care," ten of the thirty hospitals named were owned and operated by physicians.

36.     The quality at physician-owned hospitals is further illustrated by a federal quality improvement initiative.  The "Surgical Care Improvement Project" ("SCIP") is a national quality partnership sponsored by CMS and comprised of groups committed to safety of surgical care through post-operative complications.  In every category, the mean performance of physician-owned hospitals exceeds the national hospital mean by a significant margin.

37.     Patient satisfaction at hospitals is also being studied by CMS in the Hospital Consumer Assessment of Healthcare Providers and Systems ("HCAHPS").  In March of 2008, the first set of data published under HCAHPS showed that for every measurement of patient satisfaction, physician-owned hospitals exceed the national mean for all hospitals.

38.     In August 2009, the independent testing and research organization Consumer Reports released a new study considering the comments of over one million

patients around the country.  Overwhelmingly, Consumer Reports acknowledged that patients prefer and recommend the quality of care received at physician-owned and operated hospitals, supporting previous independent studies including Government data available at the CMS Hospital Compare website.  The results are significant:

a) **Arkansas** – the top two are physician-owned hospitals; four of the top seven are physician-owned hospitals;

b) **Arizona** – the top hospital is physician-owned; four of the top five are physician-owned hospitals;

c) **California** – the top two are physician-owned hospitals;

d) **Colorado** – the top hospital is physician-owned;

e) **Idaho** – the top two are physician-owned hospitals; plus three of the top four are physician-owned hospitals;

f) **Indiana** – the top two are physician-owned hospitals; four of the top five are physician-owned hospitals;

g) **Kansas** – the top five are physician-owned hospitals; plus 10 of the top 13 are physician-owned hospitals;

h) **Louisiana** – the top nine hospitals are all physician-owned hospitals;

i) **Montana** – the top hospitals is physician-owned; two of the top four are physician-owned hospitals;

j) **North Carolina** – the top hospital is physician-owned;

k) **Nebraska** – the top hospital is physician-owned;

l) **New Mexico** – the top hospital is physician-owned;

m) **Nevada** – the top hospital is physician-owned;

n) **Ohio** – the top two hospitals are physician-owned;

o) **Oklahoma** – the top hospital is physician-owned; eight of the top ten are physician-owned hospitals;

p) **South Dakota** – five of the top six are physician-owned hospitals;

q) **Texas** – the top three are physician-owned hospitals; sixteen of the top twenty-six are physician-owned hospitals;

r) **Utah** – the top hospital is a physician-owned hospital;

s) **Washington** – the top hospital is physician-owned;

t) **Wisconsin** – the top two hospitals are physician-owned.

39.    Despite the clean bill of health from the Government and with no support from objective studies and evaluations, the American Hospital Association and the Federation of American Hospitals, representing the interests of non-physician-owned hospitals, continued to attack physician-owned hospitals for purely political and competitive reasons, gaining little traction until there were deals to be cut with Congress during contentious national health care reform deliberations.

**National Health Care Reform**

40.    In 2009, Congress declared a crisis in American healthcare, predicting hospital closures, spiraling cost and the absence of solvent, accredited, and available health care facilities if the Government did not act.  Congress introduced a series of legislative initiatives.

41.    As part of the debate, critics of physician-owned hospitals argued that if the law limited the number of physician-owned hospitals and prohibited further expansion of the existing physician-owned facilities, this would somehow reduce costs to the Medicare program.   The argument is based on erroneous and unproven assumptions.

42.    Independent studies show that physician-owned hospitals do not increase Medicare costs. For example, the Health Economics Consulting Group concluded in April of 2008 that there was no statistical significance in Medicare expenditures per

capita if there was a physician-owned hospital in the community.  See "The Effects of Physician-Owned Hospitals on Medicare Expenditures Per Capita: An Instrumental Variable Approach to Endogenous Market Entry" (April 12, 2008).  Only outfits affiliated with or paid by non-physician-owned hospital groups concluded otherwise in methodologically flawed releases.

43.    A new study reported in the Journal of Bone and Joint Surgery concludes that physician-ownership of hospitals does not increase utilization.[1]

44.    On about July 6, 2009, Congress and the administration "cut" a "deal" with non-physician-owned hospitals, in which the large-hospital lobby would acquiesce to low reimbursement rates in return for curbs on physicians-owned hospitals ("the Competition Closeout").[2]

45.    On March 23, 2010, President Obama signed the Physician Hospital Law.

46.    The Physician Hospital Law contains several provisions that strike at the ability of physicians to take an ownership interest in American hospitals.  It prevents any physician-owned hospital from becoming Medicare-certified after this year, purports to block any increase in the percentage of physician ownership in existing Medicare-certified hospitals and tries to limit expansion of existing Medicare-certified physician owned hospitals.

---

[1]   "The Impact of New Hospital Orthopaedic Surgery Programs on Total Joint Arthroplasty Utilization," Xin Lu, MS, Tyson P. Hagen, MD, Mary S. Vaughan-Sarrazin, PhD and Peter Cram, MD, MBA.

[2] David Burda, Editorial, "Blow at doc ownership raises questions over hospital lobby's reform deal," Modern Physician, July 13, 2009, available at http://www.modernphysician.com/article/20090713/MODERNPHYSICIAN/307059985.

47.     The prohibition against physician ownership of hospitals in the Physician Hospital Law is an effort by Congress, with no rational basis or reasonable proportionality, to assist one group of hospitals over another and to burden doctors who are hospital owners, as opposed to hospital owners of all other professions.  For non-legitimate reasons, Congress awarded competitive advantages to one class of hospital owners—non-physicians—in order to disadvantage and eventually destroy physician-owned hospitals as an economic model.  Congress garnered support for its proposals from the large-hospital associations by promising to limit the ability of new and existing physician-owned hospitals that compete with non-physician-owned hospitals.

48.     Furthermore, the Physician Hospital Law imposes unconstitutionally vague restrictions on the growth of physician-owned hospitals unless a given hospital can meet certain unclear and nebulous standards to obtain an undefined "exception" from DHHS.

## COUNT I – VIOLATION OF DUE PROCESS

49.     Plaintiffs incorporate paragraphs 1 through 48.

50.     The Fifth Amendment to the Constitution of the United States provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." (U.S. Const. Amend. V.)

51.     Under a Due Process analysis, a law cannot be lodged solely for a private, non-public purpose.

52.     The Physician Hospital Law purports to prevent the growth of Medicare-certified physician-owned hospitals, limit the ownership interest a physician can have in a Medicare-certified hospital, and prohibits any existing physician-owned hospital from

expanding unless that hospital meets certain vague and contradictory qualifications that will allow an "exception" to the law's general prohibition on growth.

53.     The Physician Hospital Law nullified physician investment in the land, design, materials, and process of facility expansion through administrative constraints imposed by law.

54.     Congress's purpose in enacting the Physician Hospital Law is to constrict the economic effectiveness of physician-owned hospitals and to benefit non-physician-owned hospitals.   The illegitimate government purpose behind the Physician Hospital Law does not constitutionally justify the retroactive financial deprivation that will be sustained by physicians, many of whom have lawfully and responsibly committed significant funds to acquire, build, or expand upon a hospital.   These physicians' investments are extinguished or severely diminished by the Physician Hospital Law in violation of Due Process, and the Law does not provide for compensation for these affected physicians.

### COUNT II – VIOLATION OF DUE EQUAL PROTECTION

55.     Plaintiffs incorporate paragraphs 1 through 54.

56.     The Supreme Court has interpreted the Fifth Amendment's Due Process clause of the Constitution to include an equal protection element that applies to federal statutes.

57.     Whenever Government uses a licensing scheme to pick winners within a similarly-situated class of businesses, it must do so with a rational basis.

58.     The large and organized non-physician-owned hospitals have been empowered by Congress categorically to prosper under the Physician Hospital Law.

16

59.     Congress's clear economic favoritism towards the non-physician-owned hospital lobby is an Equal Protection violation, because the Law's lopsided classification is not justified by any public interest.

### COUNT III – VOID FOR VAGUENESS

60.     Plaintiffs incorporate paragraphs 1 through 59.

61.     A statute may be void for vagueness when it runs afoul of the Fifth Amendment's Due Process Clause by failing to give adequate notice to the public of prohibited behavior or adequate guidance to law enforcement in prosecuting violations.

62.     A statue is unconstitutionally vague when people of common intelligence must guess at its meaning, and differ as to its application.

63.     When a statute does not give potential violators fair notice of what actions are prohibited, that statute should be enjoined to prevent irreparable injury.

64.     The Law places unclear and contradictory limitations on the possible allowance of a Medicare-certified physician-owned hospital's right to expand and develop into the future, making the law unconstitutionally vague.

### COUNT IV – UNCONSTITUTIONAL TAKING

65.     Plaintiffs incorporate paragraphs 1 through 64.

66.     Under the Fifth Amendment of the United States Constitution, a taking occurs when a law restricts a citizen's use of his property and significantly diminishes the value of that property in an attempt to promote the public welfare.

67.     Congress's purpose in enacting the Physician Hospital Law is to constrict the economic effectiveness of physician-owned hospitals.

68.    The illegitimate government purpose employed by Congress in enacting the Physician Hospital Law does not constitutionally justify the financial deprivation that will be sustained by the physicians who own a hospital, many of whom have recently committed significant funds to acquire, build, or expand upon a hospital.   These physicians' investments are severely diminished by the Physician Hospital Law, and the Law does not provide for compensation for these affected physicians.

69.    Enforcement of the Physician Hospital Law will constitute an unconstitutional and uncompensated taking of Plaintiffs' property in violation of the Fifth Amendment of the United States Constitution.

### COUNT V – REQUEST FOR PRELIMINARY INJUNCTION

70.    Plaintiffs incorporate paragraphs 1 through 69.

71.    Plaintiffs have no adequate remedy at law.

72.    Plaintiffs seek a preliminary injunction, enjoining Defendants from taking any action to enforce the Physicians Hospital Law while this case is pending.

### COUNT VI – REQUEST FOR PERMANENT INJUNCTION

73.    Plaintiffs incorporate paragraphs 1 through 72.

74.    Plaintiffs have no adequate remedy at law.

75.    Plaintiffs seek a permanent injunction, enjoining Defendants from taking any action to enforce the Physicians Hospital Law after the final resolution of this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A)     Enter a judgment declaring the Physician Hospital Law to be an unconstitutional abridgment of the Plaintiffs' rights under the Fifth Amendment of the U.S. Constitution;

(B)     Enter a preliminary injunction, pending final resolution of this matter, enjoining Defendants from taking any action to enforce the Physician Hospital Law;

(C)     Enter a permanent injunction enjoining Defendants from enforcing the Physician Hospital Law; and

(D)     Grant such other relief the Court deems proper.

Respectfully submitted,

PHYSICIAN HOSPITALS OF AMERICA

TEXAS SPINE & JOINT HOSPITAL, LTD.

By: _____
                    Counsel

Lindsey S. Birdsong
Texas Bar No. 02333615
Birdsong & Armstrong
211 E. Houston
Tyler, Texas 75702
Tel: (903) 595-6297
Fax: (903) 595-3630
lindsey@birdsonglaw.com

Scott C. Oostdyk
Virginia Bar No. 28512
Virginia L. Hudson
Virginia Bar No. 73263
McGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, VA 23219
Tel: (804) 775-1000
Fax: (804) 775-1061
soostdyk@mcguirewoods.com
vnesbitt@mcguirewoods.com

\11524860.1